Terry McGRAW *v.* Dalton WEEKS, Jr.

95-1220                                      930 S.W.2d 365

Supreme Court of Arkansas
Opinion delivered October 21, 1996
[Petition for rehearing denied December 12, 1996.]

*Butler, Hicky & Long*, for appellant.

*W. Frank Morledge, P.A.*, for appellant Dalton Weeks, Jr..

*Easley, Hicky, Cline & Hudson*, for appellee Billy Joe Stewmon.

ROBERT H. DUDLEY, Justice. Dalton Weeks, Jr., appellee, filed this tort action for damage to his cotton crop as the result of drifting of the chemical 2,4-D after it was applied to nearby rice fields. A hormone herbicide, 2,4-D is suitable for use in rice fields, but it has a propensity to damage cotton; consequently, its use is restricted by the Arkansas State Plant Board. In 1991, when appellant Terry McGraw and Billy Jayroe applied 2,4-D to the rice fields, the Plant Board regulations prohibited the application of 2,4-D within one mile of cotton. Appellant McGraw, a farm manager, directed the ground application of 2,4-D to the levies of a rice field that was only one-quarter mile from Weeks's cotton crop.

The State Plant Board's regulations in 1991 additionally restricted the aerial application of 2,4-D to licensed aerial applicators. The Board's licensing process required both testing of the pilot and inspection of the airplane, including checks for leaks within the

application system. Jayroe employed Billy Joe Stewmon to make an aerial application of 2,4-D on his rice crop. Neither Stewmon nor his plane were tested or examined by the State Plant Board, and Stewmon was not licensed to apply 2,4-D. In addition, a nozzle on Stewmon's plane leaked during the application for Jayroe.

Weeks brought this suit against McGraw, Jayroe, and Stewmon. Each denied liability, and each filed cross-claims against the other for indemnity and contribution. After a four-day trial, the jury returned a unanimous verdict of $55,000 in damages to Weeks, unanimously apportioned 75% of the fault for the damage to Stewmon, the aerial applicator, and unanimously apportioned 25% to McGraw, who directed the ground application. By a majority verdict, the jury found no fault on the part of Jayroe, the rice farmer who employed the aerial applicator. The trial court subsequently entered judgment against McGraw and Stewmon jointly and severally. McGraw appeals. There is no reversible error, and we affirm.

McGraw's first assignment is that the trial court erred in ruling that he and Stewmon were jointly and severally liable. He argued to the trial court that the jury's conclusion that he was 25% responsible and Stewmon was 75% responsible was not supported by substantial evidence because the proof showed that he caused injury to slightly less than fifty acres, while Stewmon damaged the remaining 150 acres. The trial court found that, even though each tortfeasor's act or negligence might not have caused all of the damage, they combined to produce, for the most part, a single injury, and each was responsible for the entire result.

Much of McGraw's argument on appeal is premised on the theory that joint tortfeasors must act in concert for joint and several liability to attach, but that is not the law in Arkansas. Consequently, McGraw's citations to numerous cases from other jurisdictions do not afford him relief. We have long said that it is not necessary that the parties be acting in concert in order to be jointly and severally liable. *Applegate* v. *Riggal*, 229 Ark. 773, 318 S.W.2d 596 (1958). In this state, joint and several liability is measured by impact, and where there is a single injury, it does not matter whether the individual acts alone would not have caused the entire result. *Woodward* v. *Blythe*, 249 Ark. 793, 462 S.W.2d 205 (1971). The case of *Van Troop* v. *Dew*, 150 Ark. 560, 234 S.W. 992 (1921), is instructive. In that case, some farmers sued construction contractors

and subcontractors who were responsible for a broken fence that allowed cattle to enter their land and destroy their crops. *Id.* at 562, 234 S.W. at 993. Joint and several liability was imposed on the contractors by the trial court. Appellant Van Troop argued on appeal that he caused only one gap in the fence, which he closed in a few days, while some of the other defendants made various gaps in the fences and made no effort to repair or guard them. *Id.* at 561, 234 S.W. at 994. We affirmed the trial court and, in pertinent part, wrote:

> [T]here is joint liability where the different acts of negligence concur as to time and place and unite in setting in operation the force which causes the injury. In other words, they used the open gaps for the same purposes and at the same time, each being under duty to repair the gaps, and the conduct of each resulted in admission into the field of large numbers of cattle. It cannot be said that the entrance of the cattle was the result of the separate acts of either, but it was rather the result of the act of both of the parties in failing to repair the gaps so as to keep the cattle out.

*Id.* at 565, 234 S.W. at 994. In the case at bar, the damage to Weeks's cotton crop was the result of the acts of both McGraw and Stewmon in negligently applying 2,4-D, and the trial court ruled that it was impossible to determine in what proportion each contributed to the damages.

McGraw also argues that the damage to Weeks's cotton crop was divisible. The trial court's finding necessarily implied that the damage was indivisible, and we affirm that finding because it was not clearly erroneous. Earnest Hill, who was employed by the State Plant Board in 1991, testified that he was unable to state with any degree of certainty how many acres McGraw's applications damaged and he could not say how many acres Stewmon's application damaged. He was then questioned about a report he prepared that referred to fifty-seven acres and one hundred acres. He responded that the fifty-seven acres in his inspection report referred to the rice sprayed by McGraw, and the one hundred acres to the rice sprayed by Jayroe, not to the damage to Weeks's cotton. Stewmon's expert, Lee Frazier, testified that the drifts overlapped. One of the questions asked Frazier and his response are as follows:

Q. No, I'm not asking you where they were. Maybe

my question wasn't asked. As to what was where, whatever was there, you can't separate it as to where one starts and one stops.

A. No, Sir. All those applications were made generally in the same time frame. Had there been some time difference between the applications you may have been able to separate what came from what application. What happens on a cotton plant if you get two real close applications it all looks like the same symptoms. If you get one exposure the cotton plant has a chance to recover and starts to put on normal leaves. Then you get another exposure so then you've got heavy symptoms, like symptoms, or no symptoms, and then heavy symptoms again. All these applications were apparently within the same time frame, ten or twelve days there, and the cotton plant just didn't have enough time to recover and put on new leaves in between.

■ Thus, the trial court's ruling that the damage to Weeks's cotton crop was one injury was not clearly erroneous. The trial court correctly applied the law of joint and several liability.

McGraw's next point of appeal is composed of three subpoints and comes about as follows. Over McGraw's, Stewmon's, and Jayroe's objections, Weeks testified that, if not for the damage to his cotton crop, he would have contracted in June for the sale of his cotton at sixty-eight cents per pound for future delivery. Because the trial court allowed the testimony in evidence, McGraw, Stewmon, and Jayroe asked the trial court to modify the A.M.I. crop damage instructions, A.M.I. Civ. 3d 2220, 2221, and 2225. They asked that the principle implicit in the Model Instructions, that the relevant time for valuing a marketable crop is "at the time of the harvest," be made explicit. The trial court refused to add the phrase "at the time of harvest" to the instructions. Weeks testified about the history of the cotton yield for the field in which the damage occurred and, on rebuttal, testified about the yields for three years after the damage. On appeal, McGraw renews his objection to (1) the testimony about the price at which Weeks "would" have contracted to sell his cotton, (2) the refusal to modify the A.M.I. instructions, and (3) the yield-history proof.

■ We need not decide McGraw's first subpoint about Weeks's testimony that, except for the damage, he would have

booked his cotton in June at sixty-eight cents per pound. The jury awarded Weeks $55,000, and that award was clearly based on a price of 53.6 cents per pound, the price Weeks received in the fall on the open market for cotton grown and harvested on a nearby undamaged field. Thus, the testimony about the futures contract, even if erroneously admitted, could not have harmed McGraw.

■ We treat McGraw's second subpoint, the one concerning modification of the Model Instructions, similarly. All parties agree that Weeks's cotton crop was damaged, but marketable. Arkansas law provides that when a crop is damaged but nonetheless grows to maturity, the damages are the difference between the market value, at the time of harvest, of the crop actually produced and the crop that would have been produced without the damage, less the costs of production. *St. Louis Southwestern Ry. Co.* v. *Morris*, 76 Ark. 542, 89 S.W. 846 (1905); Howard Brill, *Arkansas Law of Damages*, § 32-4 at 426-27 (2d ed. 1990). The Model Instructions recognize that the open market determines the price and that the time of harvest is the critical date for valuation of a marketable but damaged crop. The Model Instructions, as adapted to this case, provided that "fair market value" meant the difference between "the price that the cotton of Dalton Weeks would bring on the open market" and the "fair market value...[of] the crop actually produced" less the costs "to produce, harvest, and market the crop." A.M.I. Civ. 3d 2220 & 2225. Obviously, the jury understood these instructions to mean that the open market at the time of harvest was the critical price and date for valuation because the award was based on 53.6 cents per pound, the price Weeks received on the open market after harvest for cotton from an undamaged and adjoining field.

The above two subpoints were extensively discussed in our decisional conference. The testimony at trial and the oral arguments before us have impressed upon us the fact that farmers today often make commitments for future delivery of commodities. We have some concern that our Model Instructions make no distinction between the traditional "spot" price for commodities on the "open" market and a "futures" contract. The "spot" price for cotton and other commodities and the "cash" price for grains on the "open" market are the prices assumed to determine fair market value by the Model Instructions. These prices are sometimes called the "actuals" and mean the price when the commodities are ready for immediate delivery. John Downes and Jordan Elliot Goodman,

*Barron's Finance and Investment Handbook*, at 27-30, 133-34, 491 (3d ed. 1990). In past years, the "open" or "spot" price was the only one available to the producing farmers and is the only price discussed in our seminal case on such damages. *See St. Louis Southwestern Ry. Co. v. Morris*, 76 Ark. 542, 89 S.W. 846 (1905). However, today, the "futures contract" is often employed by the producers of commodities. Through the use of a futures contract, or "booking," the producer of a commodity can make a commitment to sell a specified quantity of a commodity at a specified price during a particular delivery month. Downes and Goodman, *supra*. In this way a farmer can hedge the position in his underlying crop. He can use a futures contract to create a countervailing position and thus protect against loss due to price changes. A farmer might book 100 bales of cotton in June for delivery in November at seventy cents per pound. The farmer knows that he will make a profit at that price and knows that, without any real question, in November he can deliver 100 bales of cotton, which is converted into a fixed number of pounds. Under this hypothetical illustration, the farmer, by hedging, has fixed his profit. If the spot price should be lower in November, the farmer does not suffer the lower price. On the other hand, if the spot price is higher in November, the farmer does not get the higher price.

Today there are occasions when "booking" prices should be admissible in evidence. Many factors must be weighed before a trial judge allows such evidence because of the possibility that it would amount to speculation. It would amount to nothing more than conjecture to allow a farmer who had never booked a commodity and who did not have an irrigation system that would assure a certain amount of production to testify that he "would have" booked a commodity. On the other hand, a futures price might be allowed in evidence for a farmer who has a consistent history of production of a commodity and customarily books at a particular time of the year. Because of this changing practice of producers to utilize futures prices, we ask our Committee on Model Jury Instructions—Civil to look into the appropriateness of modifying or adding an instruction on futures fair market value to the current Model Instructions.

In his third subpoint, McGraw contends that the trial court erred in allowing Weeks to testify about his yields per acre in years subsequent to the year of loss. The short answer to the

argument is that the trial court allowed the evidence, not as a measure of damages, but to rebut McGraw's claims that the field was not suited to the growing of cotton. As such, it was not error to allow the testimony.

██ McGraw's next assignment of error involves a ruling by the trial court that Lee Frazier, Stewmon's expert witness, could remain in the courtroom during the trial even though McGraw had asked that "the rule" be invoked. Stewmon gave notice that the expert witness's opinion would be partially based upon trial testimony. Rule 615 of the Arkansas Rules of Evidence provides that the trial court "shall" exclude witnesses from the courtroom when requested, *Blaylock* v. *Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987), but the rule also provides three exceptions, one of which is for "a person whose presence is shown by a party to be essential to the presentation of his cause." Ark. R. Evid. 615(3). Under this exception a party must show that the witness would be unable to present essential testimony without hearing the actual testimony of other witnesses, or that the witness has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence and aid of the witness. *Oliver B. Cannon & Son, Inc.* v. *Fidelity & Casualty Co.*, 519 F. Supp. 668 (D. Del. 1981). Here, the trial court ruled that Stewmon made a sufficient showing that the expert would be unable to present essential testimony without hearing the testimony of other witnesses. The standard of appellate review is whether the trial court abused its discretion. *Martin* v. *State*, 22 Ark. App. 126, 726 S.W.2d 287 (1987). We cannot say the trial court abused its discretion in the ruling.

██ McGraw next contends that the trial court erred in allowing the jury to view the fields. Arkansas Code Annotated section 16-64-113 (1987) provides that the trial court may allow the jury to visit the place where the material fact of a trial occurred, and we have said that jury visits to a relevant site are within the discretion of the trial court. *Arkansas State Highway Comm'n* v. *Carder*, 228 Ark. 8, 305 S.W.2d 330 (1957). Here, the trial court did not abuse its discretion in allowing the jury to visit the place where the material facts took place.

McGraw's next assignment is that the trial court erred in refusing to grant a directed verdict in his favor. At the close of all of the evidence he moved for a directed verdict on the ground that he

was not the owner of the rice farm on which he directed the application of 2,4-D; rather, Eugene McGraw Farms, Inc., which was not a party to the lawsuit, was the owner, and the employee who did the spraying was the corporation's employee, not his. McGraw was the farm manager for Eugene McGraw Farms, Inc. Further, he argued that the ultimate decision to spray was not his, but was Norris Powell's, and Powell was not a party to the suit. McGraw makes the same arguments on appeal.

■ When it can be shown that an individual employed by a corporation is personally involved in the events surrounding an injury, the individual may be sued. *Cash* v. *Carter*, 312 Ark. 41, 847 S.W.2d 18 (1993). Here there was sufficient evidence to show that McGraw was personally involved. McGraw supervised and ran the farming operations of Eugene McGraw Farms, Inc. He made the decision to apply 2,4-D to the levies in the rice field that belonged to Eugene McGraw Farms, Inc. He instructed Norris Powell, an employee of the corporation, to apply the chemicals. His testimony is abstracted as follows: "I told my employee what to put out, when to put it out, where, how to mix it and even what gear to drive the tractor in." He admitted that he did not know that the State Plant Board regulations had been amended to provide that the use of an anti-drift agent was required when spraying within one mile of cotton. He admitted that he did not direct the use of an anti-drift agent. He admitted that he knew that 2,4-D was "the death of cotton." He admitted that applications were made on "several mornings and one afternoon." He admitted that he knew that his neighbor Weeks had cotton on his land, but denied knowing the distance to Weeks's field. Other testimony established that the rice field and Weeks's cotton field were only 440 yards apart. Powell, the employee who applied the 2,4-D, testified that McGraw directed him to apply it. Powell's testimony, in part, was as follows:

Q. What did you say?

A. Nothing. I went and sprayed it. I was following orders.

Q. Whose orders?

A. Terry McGraw.

On cross-examination Powell testified that if he had gotten up in the morning and if the wind was blowing in the direction of the cotton, he would not have sprayed it at that time, and that he could

have made that decision on his own. McGraw latches onto this statement in cross-examination and, because of it, contends that the judgment to spray was made by Powell, not him; therefore, there was insufficient evidence that he directed the application of the chemical and proximately caused the damage to the cotton crop. The argument does not prevail. The above facts, and all the reasonable inferences from them, created a question for the jury. Proximate cause is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *Skinner* v. *R.J. Griffin & Co.*, 313 Ark. 430, 855 S.W.2d 913 (1993). Here, there was testimony that drifting chemicals caused the damage and that McGraw ordered the spraying without knowing how close the cotton was.

McGraw's final argument is that the court should have modified A.M.I. Civ. 3d 709 by substituting Jayroe's name in place of "employer" and Stewmon's name in place of "independent contractor." Model Instruction 709 states that an employer is under a duty to select a competent independent contractor. He contends that the instruction misled the jury into thinking that he was responsible as a matter of law for the negligence of Powell. The argument is without merit since no one sought a verdict against McGraw under the doctrine of *respondeat superior*. Rather, one interrogatory inquired about McGraw's personal negligence, and another inquired whether Stewmon was the agent of Jayroe. There simply was no basis for the jury to find that McGraw was liable under the doctrine of *respondeat superior*. Instructions are not to be viewed in isolation, but are to be considered as a whole to determine whether the law applicable to a case is correctly declared. *Porter* v. *Lincoln*, 282 Ark. 258, 668 S.W.2d 11 (1984). The other instructions make the issue clear. *Id.*

Affirmed.