In re: **METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION**

This document relates to: County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al., 04 Civ. 5424

No. 1:00–1898.
Nos. MDL 1358(SAS), M 21–88.

United States District Court,
S.D. New York.

Aug. 18, 2006.

Carla M. Burke, Scott Summy, Baron & Budd, P.C., Dallas, TX, Robin Greenwald, Robert Gordon, C. Sanders McNew, Weitz & Luxenberg, P.C., New York City, for Plaintiffs.

Stuart A. Raphael, Hunton & Williams LLP, McLean, VA, Joseph C. Kearfott, George P. Sibley, III, Hunton & Williams LLP, Richmond VA, for Flint Hills Resources, LP and on behalf of defendants listed in Def. Mem. at ii.

Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emery LLP, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek relief from contamination, or threatened contamination, of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol ("TBA"), a product that is formed by the natural degradation of MTBE in water. The parties have already engaged in extensive motion practice, and familiarity with the Court's previous opin-

ions is assumed.[1] The facts underlying this case are comprehensively set out in those opinions.[2]

## A. Procedural History

County of Suffolk and Suffolk County Water Authority pled causes of action for public nuisance, design defect, failure to warn, negligence, private nuisance, trespass, civil conspiracy, violation of section 349 of the General Business Law, and violation of section 170 of the Navigation Law.[3] Plaintiffs alleged that their property is contaminated with MTBE; MTBE is a fungible product; the manufacturers of the offending product cannot be identified; and defendants are manufacturers that together control a substantial share of the market for MTBE-containing gasoline.[4] This Court denied defendants' motion to dismiss based on plaintiffs' alleged inability to prove proximate cause (*i.e.*, which defendant's product caused their injury), finding these allegations sufficient to support the application of market share liability under New York law.[5]

---

**1.** *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 438 F.Supp.2d 291 (S.D.N.Y.2006); *In re MTBE Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2006 WL 1738233 (S.D.N.Y. June 23, 2006); *In re MTBE Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2006 WL 928997 (S.D.N.Y. Apr. 7, 2006), *motion for reconsideration denied*, 2006 WL 1816308 (June 26, 2006); *In re MTBE Prods. Liab. Litig.*, 415 F.Supp.2d 261 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, 399 F.Supp.2d 340 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, 399 F.Supp.2d 325 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. June 28, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. June 24, 2005); *In re MTBE Prods. Liab. Litig.*, 402 F.Supp.2d 434 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, 399 F.Supp.2d 242 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, 233 F.R.D. 133 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d 348, 364 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); *In re MTBE Prods. Liab. Litig.*, 364 F.Supp.2d 329 (S.D.N.Y.2004); *In re MTBE Prods. Liab. Litig.*, 361 F.Supp.2d 137 (S.D.N.Y.2004) ("MTBE VI"); *In re MTBE Prods. Liab. Litig.*, 341 F.Supp.2d 386 (S.D.N.Y.2004) ("MTBE V"); *In re MTBE Prods. Liab. Litig.*, 341 F.Supp.2d 351 (S.D.N.Y.2004) ("MTBE IV"); *In re MTBE Prods. Liab. Litig.*, 342 F.Supp.2d 147 (S.D.N.Y.2004) ("MTBE III"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y.2002) ("MTBE II"); *In re MTBE*

*Prods. Liab. Litig.*, 175 F.Supp.2d 593 (S.D.N.Y.2001) ("MTBE I").

**2.** For a thorough recitation of plaintiffs' fact allegations see, for example, *In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d at 364–67.

**3.** *See* Fourth Amended Complaint, *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, No. 04–5424 ("Complaint") ¶¶ 201–262. *See also In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d at 433.

**4.** *See* Complaint ¶¶ 191–197.

**5.** *See In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d at 425. *See also MTBE I*, 175 F.Supp.2d at 621, 622 n. 42 (finding that market share liability applied to similar allegations); *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 507, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989) (acknowledging, in a similar context, women whose mothers took diethylstilbestrol ("DES") while the mothers were pregnant needed a "realistic avenue of relief"). In *MTBE I*, this Court also held that without further discovery, it would be inappropriate to exclude the concert of action theory as a possible basis of liability where the plaintiffs had alleged conspiracy. *See MTBE I*, 175 F.Supp.2d at 633; Restatement (Second) of Torts § 876 (1965). Plaintiffs contended that defendants acted together to create a market for MTBE, to conceal the nature of MTBE, and to maximize profits in a way defendants knew would result in contamination of plaintiffs' groundwater. They alleged that defendants' conspiratorial acts included failing to provide sufficient warnings, fighting underground storage tank legislation,

In September, 2005, five months after the decision on the motion to dismiss, plaintiffs asked that any defendant who could prove that it should not be held liable under a market share theory, because it could not have been part of the relevant market, move for summary judgment (*i.e.*, an exculpation motion).[6] Defendants, in turn, argued that before they should be required to make motions to exculpate themselves from liability under a market share theory, plaintiffs should be required to show that they were entitled to use alternative theories of liability because they could not identify a specific responsible party that caused the alleged contamination.[7] At a conference held on September 14, 2005, I agreed with defendants and directed that the parties engage in discovery with respect to four specific wells, two to be identified by plaintiffs, and two by defendants, with the goal of determining whether it was possible to identify the party or parties responsible for the alleged contamination.[8] After three months of discovery, plaintiffs filed the instant motion, asserting, in essence, that because they

could not identify the producer, refiner, or supplier of the MTBE-containing gasoline found in their wells, they should be allowed to sue all defendants under either a theory of concurrent wrongdoing[9] or a theory of market share liability.[10]

The briefing of this issue has revealed a fundamental problem. Plaintiffs and defendants are arguing at cross-purposes. Plaintiffs assert that they are unable to identify the producer, refiner, or supplier of *any* of the MTBE found in the water supply of any particular well. Defendants, in turn, argue that while plaintiffs cannot identify the producer, refiner, or supplier of the MTBE found in the groundwater, they can identify the party or parties *responsible* for the contamination, either by identifying the owner of the contaminating product or the entity that by its negligence allowed the product to contaminate plaintiffs' wells. Thus, in defendants' view, even though the contaminant was a commingled product containing gasoline from many producers, the relevant question is whether plaintiffs can identify the *source*

and collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the Reformulated Gasoline Program. *See* Complaint ¶¶ 201–204. Plaintiffs' instant motion does not address—nor will this Opinion—enterprise liability and concert of action as additional theories of liability.

6. *See* 9/14/05 Transcript of Court Conference at 4–11.

7. *See id.* at 9.

8. *See id.* at 8 (instructing plaintiffs to identify two wells for purposes of this motion); 12/20/05 Transcript of Court Conference at 131–132 (allowing defendants to identify two wells for purposes of the motion). Plaintiffs and defendants conducted discovery on the following four wells: Church St. # 1, Samuel St. # 4, Oak St. # 1, and Strathmore Court # 3.

9. Although this principle is sometimes called "concurrent negligence," this Court has used (and will continue to use) the broader term "concurrent wrongdoing" to encompass cases in which multiple defendants may have acted intentionally or recklessly to cause the same harm or an indivisible injury.

10. *See* Motion to Apply Causation Theories ("Pl.Mem.") at 2, 23 (asking the Court to (1) find that all defendants who injected gasoline products into the commingled market that reaches Suffolk County proximately caused plaintiffs' injuries, (2) shift the burden of proof of causation to defendants to exculpate themselves from such a finding, (3) apply the traditional principle of concurrent wrongdoing to hold defendants jointly and severally liable for plaintiffs' indivisible injuries, or, in the alternative, to apply market share liability or the commingled product theory of market share liability).

of the contamination.[11] Defendants argue that with respect to most, if not all, of the wells, plaintiffs can identify the source of an alleged contamination, and then trace the title of ownership of the product emanating from that source.

This fundamental distinction has caused much confusion, which it is now the Court's obligation to clarify. To some extent both sides are right. The proof submitted in the instant motion, through defendants' own expert,[12] reveals that the MTBE-containing gasoline cannot be deconstructed. In other words, once it is found in the ground it is impossible to know whose product is a part of an admittedly commingled gaseous substance. On the other hand, the contamination of some wells can be traced to a particular source. When that can be done, it is likely that responsible parties can be identified (i.e., the owner of the tank that leaked, or the truck that overturned, and possibly the supplier of the product in that tank). In that case, plaintiffs can sue the responsible party or parties, and if they can be made whole by such parties, then they have an available remedy and need not pursue an alternative theory of liability, created for the purpose of providing a remedy to plaintiffs who cannot identify a responsible party. When, however, plaintiffs cannot identify a source, or a "make-whole" defendant or defendants, then they should be permitted to proceed under an alternative theory of liability because they cannot identify the producer, refiner, or supplier of the MTBE-containing gasoline found in the well. Once it is determined—on a motion for summary judgment or at trial—that plaintiffs can rely on an alternative theory of liability, with respect to a remedy for injury to a particular well, then defendants will have the burden to show that they should be dismissed because they could not have been part of the relevant market (i.e., an "exculpation" motion). With this explanation, I turn to plaintiffs' instant motion.

## B. Standard of Review

■ This motion is a procedural anomaly. Plaintiffs do not cite to any of the Federal Rules of Civil Procedure in their motion. Plaintiffs noted at oral argument that "the purpose of the motion [ ] was for the Court to give us some guidance that, yes, these are theories you may proceed on for trial."[13] But, this Court may not issue advisory opinions.[14] Plaintiffs'

11. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Apply Causation Theories ("Def.Mem.") at 3–4 (arguing that defendants' expert had discovered that the MTBE at Samuel St. # 4 came from a nearby service station, that there were several potential sources for the MTBE at Strathmore Ct. # 3, including a debris pile, that the MTBE in Oak St. # 1 was the result of "residual contamination from a massive gasoline release at the Northville Industries terminal," and that the MTBE in Church St. # 1 came from a 4,000 gallon gasoline release from a Sunoco service station that was discovered in 1989).

12. *See* Pl. Mem. at 18 (citing 10/19/01 Deposition of John B. O'Brien, South Lake Tahoe Public Utility District v. Atlantic Richfield Co., Arco Chemical Co., Shell Oil Co., et al., No.

999128 (Cal.Sup.Ct.). at 721, Ex. M to Pl. Mem.) (noting that if gasoline is mixed, it is impossible to identify "whose gasoline it is . . . There's no tags on these molecules" and if gasoline is spilled it has "already been commingled with other people's [gasoline], there's no way to tell the difference between the molecules in there to see which ones came from one source or which ones came from another source.").

13. 7/25/06 Transcript of Court Conference at 108.

14. *See Vieth v. Jubelirer,* 541 U.S. 267, 302, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (noting that separation of powers between the three branches of government prevents the giving of advisory opinions); *Alabama v. Shel-*

motion must be viewed as either a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) or a motion for partial summary judgment under Rule 56. As plaintiffs have submitted affidavits and other matters outside the pleadings, regardless of which Rule the Court chooses, the standard to be applied is the standard for summary judgment.[15] In addition, because plaintiffs brought this motion, they are on notice that the theories they seek to apply may be rejected by the Court.

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[16] An issue of fact is genuine if "the evidence is such that a jury could return a verdict for the nonmoving party."[17] A fact is material when it "might affect the outcome of the suit under the governing law."[18] The movant has the burden of demonstrating that no genuine issue of material fact exists.[19]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[20] To do so, it must do more than show that there is "'metaphysical doubt as to the material facts.'"[21] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[22]

The question, then, is whether plaintiffs are entitled to judgment as a matter of law allowing them to apply a particular causation theory. For the reasons described below, I conclude that plaintiffs may not rely on the theory of concurrent wrongdoing, with a limited exception discussed below.[23] Plaintiffs' remaining theo-

*ton*, 535 U.S. 654, 676, 122 S.Ct. 1764, 152 L.Ed.2d 888 (2002) (noting the Supreme Court's "longstanding refusal to issue advisory opinions").

15. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988) ("Under [Rule] 12(c), the court may consider, 'in its discretion and upon notice to all parties,' materials outside the pleadings. If it does so, however, the motion is treated as one for summary judgment under [Rule] 56.") (quoting *Falls Riverway Realty v. City of Niagara Falls*, 754 F.2d 49, 53 (2d Cir.1985)). *See also* Fed. R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

16. Fed.R.Civ.P. 56(c).

17. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Accord Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.2006).

18. *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

19. *See, e.g., Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

20. *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001)).

21. *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 75 (2d Cir.2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

22. *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir.2004).

23. *See infra* note 68.

ries of collective liability—market share and commingled product theory of market share liability [24]—cannot be ruled out as a matter of law. Plaintiffs are entitled to proceed with these theories unless and until defendants succeed on a motion for summary judgment prohibiting plaintiffs from doing so.[25]

## II. APPLICABLE LAW

This Court has already explained the theories of collective liability that apply to plaintiffs' claims in New York.[26] A brief outline of the theories is provided here.

### A. Concurrent Wrongdoing

■■■ "When two or more tortfeasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable."[27] Concurrent wrongdoing allows joint and several liability because of the "injustice of allowing a proved wrongdoer who has in fact caused the harm to the plaintiff to escape liability merely because the harm which [it] has inflicted has combined with similar harm inflicted by other wrongdoers."[28] Further, where "one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."[29]

■■■ The theory applies only after a plaintiff proves (1) an indivisible injury and (2) that all defendants sought to be held liable actually caused the injury.[30] For liability to attach, defendants' tortious con-

---

24. *See* Complaint ¶¶ 197–200; *In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d at 378.

25. To succeed on such a motion, defendants must show that plaintiffs have offered no evidence that they are entitled to proceed with a theory of alternative liability. In other words, defendants must show that there is no genuine issue of material fact as to plaintiffs' ability to identify a responsible party or parties capable of providing a "make-whole" remedy with respect to the contamination of a particular well. Defendants may also argue, once again, that plaintiffs are not entitled to use an alternative theory of liability for other reasons. *See* discussion *infra* note 73. If, in fact, plaintiffs demonstrate in response to that motion, that they are unable to identify a responsible party or parties, capable of providing a "make-whole" remedy with respect to a particular well, and if they overcome defendants' remaining arguments, then they will be entitled to proceed with one or more alternative theories of liability. *See Conley v. Boyle Drug Co.*, 570 So.2d 275, 283 (Fla.1990) ("[A] plaintiff must make a showing that she has made a genuine attempt to locate and to identify the manufacturer responsible for her injury.").

26. *See In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d at 370–79.

27. *Ravo v. Rogatnick*, 70 N.Y.2d 305, 311–12, 520 N.Y.S.2d 533, 514 N.E.2d 1104 (1987)

(upholding the application of joint and several liability where "the evidence established that plaintiff's brain damage was a single indivisible injury, and defendant failed to submit any evidence upon which the jury could base an apportionment of damage"). *Accord Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353, 379 (E.D.N.Y.1972); *Hill v. Edmonds*, 26 A.D.2d 554, 270 N.Y.S.2d 1020, 1021 (2d Dep't 1966); *Slater v. Mersereau*, 64 N.Y. 138, 146 (1876); *McGraw v. Weeks*, 326 Ark. 285, 288, 930 S.W.2d 365 (1996).

28. Restatement (Second) of Torts § 433B(2) cmt. d. *Cf. Hymowitz*, 73 N.Y.2d at 505, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (explaining that the "central rationale for shifting the burden of proof in [concurrent wrongdoing] ... is that without this device both defendants will be silent, and plaintiff will not recover").

29. Restatement (Second) of Torts § 433B(2). *Accord Becker v. Poling Transp. Corp.*, 356 F.3d 381, 391 (2d Cir.2004); *Ravo*, 70 N.Y.2d at 310, 520 N.Y.S.2d 533, 514 N.E.2d 1104 ("[W]here two parties by their separate and independent acts of negligence, cause a single, inseparable injury, each party is responsible for the entire injury.").

30. *See Slater*, 64 N.Y. at 146 (water flowing from two sources due to two separate defendants' negligence caused an indivisible injury

duct need not be simultaneous in time, but must combine to produce plaintiff's indivisible injury.[31] "Damages are indivisible, and thus the injury is indivisible, when ... every tortious act of the defendants and other relevant persons caused all the damages. Unless sufficient evidence permits the factfinder to determine that damages are divisible, they are indivisible." [32]

■■ Concurrent wrongdoing is not a theory of alternative liability, where in order to proceed a plaintiff must show that it is otherwise without recourse.[33] Rather, when a plaintiff can prove that the injury is indivisible and all defendants contributed to it, the existence of an alternative remedy is irrelevant.[34]

■ Finally, cases applying concurrent wrongdoing typically involve a small number of tortfeasors, such that the imposition of joint and several liability does not cause disproportionate hardship to any

---

by becoming "commingled ... [and] concentrating at the same locality, soaking through the wall into the plaintiffs' premises and injuring the plaintiffs' property").

**31.** *See Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co.*, 98 F.2d 694, 697 (2d Cir.1938) ("[I]f two tortfeasors contribute to a single loss, each is liable in solido."); *Ravo*, 70 N.Y.2d at 311, 520 N.Y.S.2d 533, 514 N.E.2d 1104; *Hill*, 270 N.Y.S.2d at 1021 ("Where separate acts of negligence combine to produce directly a single injury each tortfeasor is responsible for the entire result, even though his act alone might not have caused it."); *McGraw*, 326 Ark. at 288, 930 S.W.2d 365 (upholding the application of joint and several liability based on a finding that the damage caused one injury).

**32.** Restatement (Third) of Torts: Apportionment of Liability § 26 cmt. g. (2000) *See, e.g., Hawkes v. Goll*, 256 A.D. 940, 9 N.Y.S.2d 924, 925 (2d Dep't), *aff'd*, 281 N.Y. 808, 24 N.E.2d 484 (1939) (after decedent was hit by two consecutive separate cars, the court applied joint and several liability finding that: "There could be no evidence upon which the jury could base a finding of the nature of the injuries inflicted by the first car as distinguished from those inflicted by the second car.... While the wrongful acts of the two defendants were not precisely concurrent in point of time, the defendants may nevertheless be joint tortfeasors where, as here, their several acts of neglect concurred in producing the injury."); *City of Tulsa v. Tyson Foods, Inc.*, 258 F.Supp.2d 1263, 1297 (D.Okla. 2003), *vacated pursuant to settlement*, (July 16, 2003) (finding that the "eutrophication of the lakes from excess phosphorus loading" was a single indivisible injury).

**33.** Alternative liability, as it was first explained in the seminal case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), provides that the burden of proof is shifted to the defendant to prove that it did not cause the injury, where each defendant acted tortiously, but there is uncertainty as to which of the defendants caused the injury. Under alternative liability, the burden of proof is shifted to the defendants because of the "injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." Restatement (Second) of Torts § 433B(2) cmt. f. "Failure to meet that burden results in joint and several liability with other defendants." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 822 (E.D.N.Y.1984).

**34.** *See* Restatement (Third) of Torts, Apportionment of Liability § 11 cmt. b ("Historically, several liability was employed in situations where the plaintiff's injury was divisible according to the causal contributions of multiple defendants. This use of several liability imposed a burden of proof on plaintiff to demonstrate the portion of the injury *caused by each defendant*. Thus, factual causation was the basis for determining the several-liability portion of the plaintiff's injuries for which each defendant was liable. Nevertheless, in cases in which proof was unavailable or difficult to obtain, many courts adopted joint and several liability to relieve the plaintiff of the difficulties of proof.") (emphasis added).

defendant.[35] Joint and several liability applies where "each party is individually liable to plaintiff for the whole of the damage."[36] "[A] plaintiff may proceed against any or all defendants."[37] In summary, to utilize a theory of concurrent wrongdoing, plaintiffs must show that each defendant (1) contributed to causing an (2) indivisible injury and (3) that it would not violate traditional notions of fairness and justice to hold all defendants jointly and severally liable for the injury.

### B. Market Share Liability

 New York has unequivocally adopted the market share theory of liability when the product in question is fungible, and as a result, the plaintiff cannot identify which defendant proximately caused her harm.[38] As such, it provides an exception to the general rule that a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury.[39] Under market share liability, the burden of identification shifts to defendants if plaintiff establishes a prima facie case on every element of the claim except for identification of the actual tortfeasor or tortfeasors, and plaintiff has joined manufacturers representing a "substantial share" of the relevant market.[40] Once these elements are established, each defendant is

**35.** *See, e.g., McGraw,* 326 Ark. at 288, 930 S.W.2d 365 (cotton crop damages from application of herbicide to nearby field by three defendants); *Ravo,* 70 N.Y.2d at 313, 520 N.Y.S.2d 533, 514 N.E.2d 1104 (brain damage negligently inflicted by obstetrician and pediatrician); *City of Tulsa,* 258 F.Supp.2d at 1300 (action against seven defendants for pollution of lake); *Union Texas Petroleum Corp. v. Jackson,* 909 P.2d 131, 150 (Okla.Ct.App.1995) (saltwater contamination of aquifer by two petroleum companies); Restatement (Second) of Torts § 433B(2) cmt. e (observing that typical cases applying concurrent wrongdoing principles involve two or three tortfeasors and explaining that if "a hundred factories each contribute a small, but still uncertain, amount of pollution to a stream, to hold each of them liable for the entire damage because he cannot show the amount of his contribution may perhaps be unjust").

**36.** *Hecht v. New York,* 60 N.Y.2d 57, 62, 467 N.Y.S.2d 187, 454 N.E.2d 527 (1983) (citing Restatement (Second) of Torts § 875 and cmt. b).

**37.** *Id.See also* 7/25/06 Transcript of Oral Argument at 88–89 (counsel for defendants explaining that under concurrent wrongdoing, where "every defendant contributed and caused the injury" plaintiffs are not required to sue every defendant, as defendants can implead others). In New York, defendants have the right to implead others pursuant to section 1401 of the New York Civil Practice Law and Rules ("two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought").

**38.** *See MTBE I,* 175 F.Supp.2d at 620–22 (citing *Hymowitz,* 73 N.Y.2d at 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069).

**39.** *See Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) (declining to apply market share liability to claims of negligent marketing and distribution of handguns, because, inter alia, "it is often possible to identify the caliber and manufacturer of the handgun that caused injury to a particular plaintiff....").

**40.** *Sindell v. Abbott Labs.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 936–37 (1980) (noting that where a "plaintiff joins in the action the manufacturers of a substantial share of the [product] the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff is significantly diminished"). The Restatement (Third) of Torts states:

In deciding whether to adopt a rule of [market share] liability, courts have considered the following factors: (1) the generic nature of the product; (2) the long latency period of the harm; (3) the inability of

severally liable for the portion of the judgment that represented its share of the market at the time of the injury, unless it proves that it could not have made the product that caused the plaintiff's harm.[41] In short, each defendant has the burden of exculpation and the damages are apportioned among the remaining defendants according to their share of the market.

This theory was first developed by the California Supreme Court in *Sindell v. Abbott Laboratories* to accommodate the needs of DES plaintiffs. The *Sindell* plaintiffs brought a class action against eleven drug manufacturers, alleging that defendants were jointly liable because they had acted in concert to produce, market, and promote DES as a safe and effective drug for preventing miscarriages. The *Sindell* court applied market share liability

and noted two policy considerations: (1) "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury"; and (2) holding manufacturers liable would create an incentive to produce safer products.[42] The court thought it reasonable, under the circumstances, to measure the likelihood that any one of the defendants supplied the offending product by each defendant's share of the DES market. Furthermore, by apportioning liability according to market share, "each manufacturer's liability for an injury would be approximately equivalent to the damage caused by the DES it manufactured."[43] Thus, the policy behind the application of the principle is that an innocent plaintiff should not be left *without a remedy* where each of the defendants acted tortiously. In that situation, it is reasonable to shift the burden of identi-

plaintiffs to discover which defendant's product caused plaintiff's harm, even after exhaustive discovery; (4) the clarity of the causal connection between the defective product and harm suffered by plaintiffs; (5) the absence of other medical or environmental factors that could have caused or materially contributed to the harm; and (6) the availability of sufficient 'market share' data to support a reasonable apportionment of liability.
Restatement (Third) of Torts: Products Liability § 15 cmt. c (1998).

**41.** *See In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. at 819–20 (holding that if plaintiffs could not establish that "the particular Agent Orange causing injury to the plaintiff was manufactured by that defendant," then the burden would shift to each defendant to establish that "its product could not have caused the plaintiffs' injury or, alternatively, that it should only be responsible for a proportion of the damage"). *See also Hymowitz,* 73 N.Y.2d at 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069 ("liability of DES producers is several only and should not be inflated when all participants in the market are not before the Court in a particular case"); *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470, 487 (1988) (holding defen-

dants severally liable because joint liability would "frustrate *Sindell's* goal of achieving a balance between the interest of DES plaintiffs and manufacturers of the drug."); *Smith v. Cutter Biological, Inc.,* 72 Haw. 416, 823 P.2d 717, 728–29 (1991) (applying several liability, permitting manufacturers to implead other manufacturers, and eliminating the strict requirement that plaintiffs join a "substantial share" of the market because "as long as plaintiffs realize their recovery will depend on joining as many manufacturers as they can; plaintiffs will endeavor to join all manufacturers"). *But see In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1263 (E.D.N.Y. 1985) (dismissing claims of plaintiffs who had opted out of a certified class and noting that "[h]aving voluntarily given up the advantages of the class action, each plaintiff is in the position of being unable to prove either (1) that his disease is due to Agent Orange, or (2) that any particular defendant produced the Agent Orange to which he may have been exposed. No case has ever permitted recovery in such a situation.").

**42.** *Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 936.

**43.** *Id.* at 937.

fication to the defendants.[44]

## C. "Commingled Product" Theory of Market Share Liability

This Court found, after reviewing various theories of collective liability, that from time to time courts have fashioned new approaches in order to permit plaintiffs to pursue a recovery when the facts and circumstances of their actions raised unforeseen barriers to relief.[45] Those courts made a policy decision that in balancing the rights of all parties, it would be inappropriate to foreclose plaintiffs entirely from seeking relief merely because their actions did not precisely fit the parameters of existing liability theories. Thus, while market share liability may not apply to cases where the product is commingled into a joint product—making it difficult to apportion liability based on market share—and the product does not have a long latency, a modified version of market share liability, incorporating elements of concurrent wrongdoing may apply.

■ Thus, under the "commingled product theory" of market share liability, when a plaintiff can prove that certain gaseous or liquid products (*e.g.*, gasoline, liquid propane, alcohol) of many refiners and manufacturers were present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, each refiner or manufacturer is deemed to have caused the harm. A defendant must be able to exculpate itself by proving that its product was not present at the relevant time or in the relevant place, and therefore could not be part of the commingled or blended product.[46]

■ Under this theory, defendants are not subject to joint and several liability because when "there [are] so large a number of actors, each of whom contribute[d] a relatively small and insignificant part of the total harm, ... the application of the rule [of joint and several liability] may cause disproportionate hardship to defendants."[47] Damages should be apportioned by proof of a defendant's share of the market at the time of the injury.[48]

■ Plaintiffs may sue any entity that contributed to the commingled product that caused their injury. Plaintiffs need not name all potential tortfeasors, or even a substantial share of all tortfeasors, be-

**44.** See *Smith*, 823 P.2d at 728; *Conley*, 570 So.2d at 283; *Hymowitz*, 73 N.Y.2d at 507, 541 N.Y.S.2d 941, 539 N.E.2d 1069; *Martin v. Abbott Labs.*, 102 Wash.2d 581, 689 P.2d 368, 381–82 (1984); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37, 50 (1984).

**45.** See *In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d at 377.

**46.** See *Smith*, 823 P.2d at 729 (finding that market share liability applies to suits by plaintiffs who claimed they were infected with the acquired immune deficiency syndrome virus from defendants' blood clotting product sometime during 1983 and noting that a defendant could exculpate itself if it could prove that it had no product on the market at the time of the injury). *See also Doe v. Cutter*

*Biological, Inc.*, 971 F.2d 375, 379 (9th Cir. 1992) (based on *Smith* court's answers to certified questions finding market share liability to apply, reversing district court's grant of summary judgment resulting from plaintiffs' failure to identify precisely which manufacturer's product caused plaintiffs' harm).

**47.** Restatement (Second) of Torts § 433B(2) cmt. e. *Accord Smith*, 823 P.2d at 729; *Conley*, 570 So.2d at 287; *Hymowitz*, 73 N.Y.2d at 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069; *Martin*, 689 P.2d at 383; *Collins*, 342 N.W.2d at 51.

**48.** *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir.1993) ("apportionment itself is an intensely factual determination").

cause defendants can implead other responsible parties.[49]

 Similar policy considerations supporting market share liability also apply here. Thus, if defendants breached a duty to avoid an unreasonable risk of harm resulting from the use of their products, innocent water providers—and ultimately innocent water users—should not be *denied relief* from the contamination of their water supply because they cannot identify the producer, refiner, or supplier of the MTBE-containing gasoline that caused the contamination.[50] Nonetheless, if a traditional tort theory provides plaintiffs with a remedy that makes them whole, it is inappropriate to apply alternative theories of liability that do not require plaintiffs to identify the actual tortfeasor.

## III. ANALYSIS

### A. Concurrent Negligence Is Inapplicable to Plaintiffs' Claims

#### 1. Indivisible Injury

 As noted earlier, concurrent wrongdoing occurs when a plaintiff suffers a single indivisible injury caused by more than one tortfeasor, each of whom has actually caused the harm that injured the plaintiff. The first question, then, is whether plaintiffs have alleged that the injury they suffered as a result of the MTBE contamination of their wells is indivisible. Though plaintiffs have been less than clear about whether the alleged injury is one injury to all of Suffolk County or whether each well is individually (and indivisibly) injured, plaintiffs' counsel recognized during oral argument on this motion that each well must be examined separately.[51] Because of MTBE's fungibility, once MTBE reaches a well, regardless of the MTBE's source, or the number of times MTBE seeps into the well, the well is indivisibly injured.[52] Thus, plaintiffs must establish an indivisible injury on a well-by-well basis.[53]

#### 2. Joint and Several Liability

 Even if plaintiffs have established an indivisible injury, the application of concurrent wrongdoing may still be inappropriate if it would be unfair to impose joint and several liability on defendants. Plaintiffs argue that all defendants are jointly and severally liable for "plaintiffs' indivisible injuries"[54] because the "gasoline that makes its way to Suffolk County is the

---

**49.** *See In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. at 828 (noting that it does not make sense to require "that the manufacturers of all potential causal agents be joined" if "it is not within plaintiff's power" and that if the manufacturers claim other parties are joint tortfeasors, the manufacturers are entitled to implead the joint tortfeasors).

**50.** *See In re MTBE Prods. Liab. Litig.,* 379 F.Supp.2d at 377.

**51.** *Compare* Pl. Mem. at 25 ("Gasoline products from many suppliers were completely commingled when they reached service stations in Suffolk County, and those gasoline products caused Plaintiffs' indivisible injury (*i.e.,* the contamination of Suffolk County wells).") *with* 7/25/06 Transcript of Oral Argument at 57 ("When you have two causes coming together to cause a single injury, *such as MTBE in a well,* it becomes indivisible.") (emphasis added).

**52.** *See Slater,* 64 N.Y. at 146.

**53.** There are over two hundred wells at issue in Suffolk County. Because investigation as to the source of alleged contamination in each well and then a further investigation as to the ownership of the contaminating product would be prohibitively expensive, the parties must select a representative sample of bellweather wells for trial.

**54.** Pl. Mem. at 19.

product of all refiners who inject gasoline into that commingled system."[55] Plaintiffs want the benefit of dispensing with product identification (permitted in market share liability but not permitted in concurrent wrongdoing) but also want to take advantage of joint and several liability (not permitted in market share liability but permitted in concurrent wrongdoing). This would be fundamentally unfair.

Typically, only a small number of defendants have been held jointly and severally liable under a theory of concurrent wrongdoing.[56] This makes perfect sense. In these cases, the single indivisible injury was caused by each tortfeasor: " 'although the act of each, alone and of itself, might not have caused the entire injury,' " because the injury is inseparable " 'there is no good reason why each should not be liable for the whole.' "[57]

This case is very different. Plaintiffs have named almost fifty defendants who participated in the national gasoline market during a twenty-five year period.[58] Defendants include "manufacturers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE."[59] Plaintiffs allege that each defendant's injury to each well is based on the *presumption* that every defendant's product was part of the commingled MTBE-containing gasoline that caused plaintiffs' injury.[60] It is likely that each defendant's contribution to the total volume of MTBE-containing gasoline in any particular well was very small.[61] Under these circumstances, it would be fundamentally unfair to hold these defendants jointly and severally liable.[62] Thus, plaintiffs may not utilize the theory of concurrent wrongdoing to prove their claims.

**55.** *Id.* at 16.

**56.** *See supra* note 35 and accompanying text.

**57.** *Ravo*, 70 N.Y.2d at 311, 520 N.Y.S.2d 533, 514 N.E.2d 1104 (quoting *Slater*, 64 N.Y. at 146–47 ("The water with which each of the [two] parties were instrumental in injuring the plaintiffs was one mass and inseparable, and no distinction [could] be made between the different sources from whence it flowed.")).

**58.** *See* Complaint ¶¶ 14–66, 79 ("Sometime after 1979, defendants started manufacturing, distributing, and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.").

**59.** *Id.* ¶ 9.

**60.** The imposition of joint and several liability is not unjust when plaintiff can identify with certainty each defendant that contributed to the indivisible injury.

**61.** Plaintiffs rely on cases arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, et seq., to

support the application of joint and several liability when there are numerous tortfeasors. *See* 7/25/06 Transcript of Court Conference at 53–54 (citing *Alcan Aluminum Corp.*, 990 F.2d 711; *O'Neil v. Picillo*, 883 F.2d 176 (1st Cir.1989); *City of New York v. Exxon Corp.*, 766 F.Supp. 177, 198 (S.D.N.Y.1991); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983)). This reliance is misplaced. In the CERCLA context, courts have relied on the rule of joint and several liability from the Second Restatement of Torts to hold that "damages should be apportioned only if *defendant* can demonstrate that the harm is divisible" even when there are many defendants. *O'Neil*, 883 F.2d at 178. But, the analysis does not stop there. Under CERCLA, courts have explained that it is fair to apply joint and several liability because Congress *intended* those proven to be "partially culpable to bear the cost of the uncertainty" and it established provisions for mitigating the possible unfairness of the rule in cases where there are many tortfeasors who may have only contributed a small amount to the whole injury. *Id.* at 179.

**62.** *See* Restatement (Second) of Torts § 433B(2) cmt. e.

## B. Market Share Liability and Commingled Product Theory of Market Share Liability

■ Defendants argue that plaintiffs should not be permitted to pursue alternative theories of liability because they have other "potential vehicles for asserting claims against companies involved in the manufacture or distribution" of MTBE-containing gasoline.[63] Defendants claim that where plaintiffs can identify the party that actually released the gasoline plaintiffs could sue (1) the owner or operator of the service station responsible for the gasoline release, (2) the parties that held title to the gasoline at each step of the supply chain,[64] or (3) the company licensing a retail station to sell gasoline under its "brand."[65]

Plaintiffs argue, however, that proceeding solely against service stations or other point sources known to have released MTBE-containing gasoline would "ignore" other sources of contamination. Even assuming that a particular well was contaminated as a result of an identified spill does not take into account the hundreds of unreported spills or spills from "non-point sources"[66] that may also have contributed to the contamination of those wells. Plaintiffs' argument fails. If there is an identifiable defendant (or defendants) and plaintiffs can obtain a make-whole remedy from those parties,[67] then there is no need to

---

**63.** *See* Def. Mem. at 8, 16. *See also Conley*, 570 So.2d at 286 (noting that "where a plaintiff can identify a specific tortfeasor as causing her injury and traditional remedies are thus available, we see no reason for resort to a remedy based on the concept of risk contribution").

**64.** *See* Def. Mem. at 7–8, 17 (noting that plaintiffs could sue the retailer or "jobber" on a defective product theory and the retailer or jobber could "implead upstream suppliers pursuant to well-established principles of contribution and indemnity"). Title might be established through sales agreements, bills of lading, or other documentation.

**65.** *See id.* at 9–10 (arguing that about eighty percent of the gasoline sold in Suffolk County over the last ten to twelve years has been "branded"). As the Restatement notes, "trademark licensors are liable for harm caused by defective products distributed under the licensor's trademark or logo when they participate substantially in the design, manufacture, or distribution of the licensee's products. In these circumstances they are treated as sellers of the products bearing their trademarks." Restatement (Third) of Torts: Products Liability § 14 cmt. d.

**66.** Plaintiffs' Reply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Apply Causation Theories ("Reply Mem.") at 2 (citing Paul J. Squillace, et al.,

Preliminary Assessment of the Occurrence and Possible Sources of MTBE in Groundwater in the United States 1993–1994, 30 Env. Sci & Tech. 1721, 1726–27 (1996) ("Squillace, Preliminary Assessment"), Ex. A to Reply Mem.). "Point sources" include: "underground storage tanks, pipelines, landfill sites, dumps, spills at industrial sites, underground injection, and refueling facilities." *Id.* "Non-point sources" include: "atmospheric deposition and stormwater runoff" as well as "emissions from marine engines into lakes." *Id.* at 3 (citing Squillace, Preliminary Assessment; Environmental Protection Agency, Methyl Tertiary Butyl Ether (MTBE); Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline, 65 Fed.Reg. 16094, 16095–96, 16101 (Mar. 24, 2000)). In addition, plaintiffs note that many sources of gasoline contamination are unknown and many releases are unreported. In 2005, for example, of 3,064 releases reported in Suffolk County, sources were unknown for 312 of the releases, and the quantities were unknown for 2,142 releases. *See* Pl. Mem. at 6 (citing Charts, Department of Environmental Conservation Data for Suffolk County Gasoline Spills and Unknown Petroleum Spills, Ex. F to Pl. Mem.).

**67.** This Opinion does not address whether or not the remedies defendants proposed would be viable. That must await a later motion.

turn to an alternative theory of liability to pursue other possible tortfeasors.[68] However, if the identifiable defendants cannot make plaintiffs whole, then plaintiffs may need to take advantage of the alternative theories of liability because otherwise they may be without a complete remedy.

By the same token, there may be no identifiable source of the contamination for some of plaintiffs' wells.[69] In addition, even when a spill (or leak) can be traced to a particular gas station it may be impossible to identify the *title holder* of the leaked gasoline as it not always clear which particular underground storage tank leaked.[70] Moreover, leaks are often small and continuous and where the time and amount of a release are unknown, the original title holders as well as title holders further back in the chain cannot be identified.[71] Finally, even if the source of the leak is identified, the records may simply be too difficult to obtain.[72] With respect to these wells there may be no remedy other than that based on an alternative theory of liability.

Standard market share liability is only available to plaintiffs when their claims against identifiable defendants will not make them whole. The evidentiary record has not been developed enough to determine whether plaintiffs may proceed on alternative theories of liability, and as to which wells. The applicability of alternative theories of liability, including the commingled product theory of liability ultimately depends on the evidence put forward at trial or in response to a summary judgment motion and it is therefore premature for the court to further address this issue.[73]

## IV. CONCLUSION

Plaintiffs' motion is denied in part. At this time, plaintiffs may proceed on a theory of alternative liability, subject to further motion practice. If defendants intend to file a summary judgment motion prohibiting plaintiffs from relying on alternative

---

**68.** *See Hall,* 345 F.Supp. at 383 ("A novel or boundary line principle particularly where it requires courts and litigants to assume heavy burdens, need not be extended to situations where traditional remedies are perfectly satisfactory.") (quotations and citations omitted). However, like plaintiffs, defendants cannot have it both ways: if plaintiffs can identify the actual parties that contaminated a particular well, they may be able to rely on the traditional theory of concurrent wrongdoing, including joint and several liability, when seeking to recover damages for injuries to that well.

**69.** *See supra* note 66.

**70.** *See* Reply Mem. at 7; 4/22/04 Transcript of Court Conference at 47–48.

**71.** *See* Reply Mem. at 7.

**72.** *See* 4/22/04 Transcript of Court Conference at 34–41 (defendants explaining that for one hypothetical county with 200 gas stations, each gas station could get approximately 111 deliveries a year, making 22,000 deliveries or transactions a year and 220,000 transactions over ten years "to look at" and describing title tracing as "incredibly burdensome discovery."). *See also Hymowitz,* 73 N.Y.2d at 507, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (noting the "inordinately difficult problems of proof caused by contemporary products and marketing techniques").

**73.** Defendants also argue that the preliminary discovery shows that market share liability should not apply because (1) each defendant's share of the market "does not correspond to the amount of risk created by its alleged tortious conduct," (2) plaintiffs have named participants at different levels of the market spanning a quarter-century, (3) plaintiffs have not named defendants representing a substantial share of the market for the product, and (4) market share liability is only appropriate where the injury is devastating, and here the MTBE contamination is de minimis. *See* Def. Mem. at 25. Undoubtedly, defendants will renew these arguments when they move for summary judgment.

theories of liability, they shall do so by December 1, 2006. The Clerk of the Court is directed to close this motion (docket # 867).

SO ORDERED.